UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALICE GARBOSKE,

        Plaintiff,                                  Hon. Richard Alan Enslen

v.                                                   Case No. 1:04-CV-230

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

        The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 53 years of age at the time of the ALJ's decision. (Tr. 13). She earned an Associates Degree and was previously employed as a secretary, resource coordinator, and an information technology coordinator. (Tr. 13, 85-88).

Plaintiff applied for benefits on July 30, 2002, alleging that she had been disabled since April 4, 2002, due to migraines, anxiety, stress, hernia, and acid reflux. (Tr. 52-54, 68). Plaintiff's application was denied, after which she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 21-52). On June 16, 2003, Plaintiff appeared before ALJ Daniel Dadabo, with testimony being offered by Plaintiff and vocational expert, Randall Strahl. (Tr. 510-39). In a written decision dated July 2, 2003, the ALJ determined that Plaintiff was not disabled. (Tr. 12-20). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 4-6). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## MEDICAL HISTORY

On October 10, 1997, Plaintiff was examined by Dr. Ivan Landan. (Tr. 129-30). Plaintiff reported that she was experiencing headaches. (Tr. 129). Specifically, Plaintiff reported that she was experiencing two types of headaches: (1) muscle contraction tension headaches which

radiated into her neck and shoulders, and (2) headaches which are associated with dizziness and blurred vision. *Id.* Treatment notes dated November 10, 1998, indicate that Plaintiff's headaches were "fairly well controlled" with medication. (Tr. 128).

On April 23, 2001, Plaintiff participated in a cerebral angiogram examination, the results of which revealed no evidence of aneurysm, intracranial mass, midline shift, extra-axial fluid collection or hemorrhage. (Tr. 122-23). The examination did reveal "several" areas of "nonspecific and small vessel ischemic change" which could have resulted from "migraine related ischemic insult." The doctor observed that it was "not entirely clear whether [these findings] represent interval development of these lesions or simple inability to identify them on the prior study due to technique." Accordingly, the doctor concluded that the results of this examination needed to be correlated with clinical findings. *Id.*

On December 11, 2001, Plaintiff participated in an MRI examination of her brain, the results of which revealed a "probable small lacunar infarct in the region of the thalamus on the left," but the examination was "otherwise normal." (Tr. 133-34).

On April 4, 2002, Plaintiff was examined by Dr. Christopher Hudson. (Tr. 183). Plaintiff reported that she experienced a "blackout" three days previously. She reported that this was the second such blackout she had experienced in the past three months. The results of an examination were unremarkable. *Id.*

On April 9, 2002, Plaintiff participated in an ultrasound examination of her carotid arteries, the results of which revealed "minimal stenosis bilaterally" with no evidence of flow limitation. (Tr. 145-46).

On April 12, 2002, Plaintiff was examined by cardiologists Dr. Alan Woelfel and Dr. Roger Miller. (Tr. 149-50). The results of this examination revealed that Plaintiff's heart "was normal and there was no evidence of a cardiovascular contribution to her difficulty." *Id.*

On May 1, 2002, Plaintiff was examined by Dr. Edmund Messina. (Tr. 116). Plaintiff reported that she was experiencing "severe" headaches with "moderate" cervical pain on a daily basis. She reported that her prescription medication was "sometimes effective." Plaintiff reported that her headaches were causing her to miss work. *Id.*

On May 23, 2002, Plaintiff was examined by Dr. Hudson. (Tr. 180-81). The results of a physical examination were unremarkable, but laboratory testing revealed that Plaintiff was hypoglycemic which the doctor concluded may be related to her recent black out spells. *Id.*

On May 29, 2002, Plaintiff was examined by Dr. John Visser. (Tr. 259). Plaintiff reported that a recent modification of her medication regimen had resulted in "a significant decrease in her migraine headaches." (Tr. 259).

On June 4, 2002, Plaintiff participated in an EEG examination, the results of which revealed "no hemispheric asymmetry, epileptiform activity, or other focal abnormality." (Tr. 213).

On August 21, 2002, Plaintiff participated in a sleep study, the results of which revealed "no evidence of seizure activity." (Tr. 165-67).

On October 1, 2002, Plaintiff participated in a consultive examination performed by Dennis Mulder, Ed.D. (Tr. 249-53). Plaintiff reported that she was suffering from chronic migraine headaches, as well as dizziness and blurred vision. (Tr. 249). Plaintiff reported that on a typical day she performs various household chores (e.g., vacuuming, dusting, washing dishes, cooking, and washing laundry), performs yard work, reads, and works on the computer. (Tr. 250). The results

of a mental status examination were unremarkable. (Tr. 251-52). Plaintiff was diagnosed with generalized anxiety disorder and adjustment disorder with depressed mood. (Tr. 252). Her GAF score was rated as 55. *Id.*

On October 8, 2002, Plaintiff was examined by Dr. Visser. (Tr. 256). Plaintiff reported that she was experiencing "mild" headaches every day and "bad migraines" 2-3 times weekly. The results of an examination were unremarkable. The doctor described Plaintiff's condition as "stable" and modified her medication regimen. *Id.*

On November 20, 2002, Plaintiff was examined by Dr. Visser. (Tr. 302). Plaintiff reported that she has experienced six "severe" migraine headaches over the previous five weeks. She reported that she was no longer experiencing blackouts. The results of a physical examination were unremarkable. The doctor modified Plaintiff's medication. *Id.*

On December 3, 2002, Plaintiff participated in an MRI examination of her brain, the results of which revealed "no new abnormalities." (Tr. 317-18).

On January 28, 2003, Plaintiff was examined by Dr. Visser. (Tr. 301). Plaintiff reported that her headaches "have been worse recently." She reported that she experiences headaches daily which sometimes last "throughout the day." Plaintiff denied experiencing nausea, vomiting, or blackouts. The results of a physical examination were unremarkable. The doctor modified Plaintiff's medication. *Id.*

On March 10, 2003, Plaintiff was examined by Dr. C. David Gordon. (Tr. 418-21). Plaintiff reported that she "awakens every morning to two different types of discomfort." (Tr. 419). Plaintiff described the "dominant" pain as "a dull or sharp and occasionally burning posterior cervical neck pain." She reported that this pain averaged 3, but occasionally increased to 5 (on a

scale of 1-5). Plaintiff described the other type of pain as "a constant right-sided headache." She reported that she occasionally experiences lightheadedness and blurred vision. *Id.* The results of a neurological examination were "unremarkable." (Tr. 421). Dr. Gordon instructed Plaintiff to participate in physical therapy and behavioral modification. (Tr. 418).

On March 23, 2003, Plaintiff participated in an EEG examination, the results of which were "within normal limits" with no evidence of "epileptiform features, or focal or lateralizing slow-wave abnormalities." (Tr. 446).

An MRI examination of Plaintiff's cervical spine, performed March 24, 2003, revealed moderate spondylosis at C5-6 and a "signal abnormality" from C5-6 through T1, which was "felt to be consistent with a small central syrinx."[1] (Tr. 448-49). Plaintiff participated in an angiography examination of her brain the same day, the results of which were "negative." (Tr. 450).

On April 15, 2003, Plaintiff was examined by Dr. Steven Silverman. (Tr. 456-57). Plaintiff exhibited tenderness over the C5-T1 spinous process and over the left C2, C3, C4, and C5 cervical facet joints. (Tr. 457). The doctor reported that Plaintiff's symptoms were consistent with facet joint irritation. *Id.* Dr. Silverman treated Plaintiff with a series of facet block injections. (Tr. 443).

On May 16, 2003, Plaintiff was examined by Dr. John Keller. (Tr. 486). Plaintiff walked with a normal gait. She exhibited 5/5 strength throughout and there was no evidence of positive trigger points. Romberg testing was negative and the doctor observed no evidence of neurological abnormality. Dr. Keller concluded that Plaintiff suffered from "cervical radiculopathy

---

[1] A syrinx is a fluid-filled space, often elongated, within the substance of the spinal cord. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* S-455 (Matthew Bender) (1996).

7

most likely related to the spondylitic changes and foraminal narrowing at [C]5-6." The doctor recommended to Plaintiff that she undergo surgery. *Id.*

At the administrative hearing, Plaintiff testified that she would be scheduled to undergo neck surgery in the near future. (Tr. 514-15). Plaintiff reported that during the day she performs "light" housework, reads, and watches television. (Tr. 524). She testified that she was again experiencing daily migraine headaches. *Id.* Plaintiff reported that she can stand for 30 minutes, walk one-quarter mile, but cannot sit. (Tr. 529-30). She also reported that she can lift 27 pounds with her right upper extremity. (Tr. 530-31).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional

---

[2] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

8

impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

B. **The ALJ's Decision**

The ALJ found that Plaintiff suffers from the following severe impairments: (1) moderately severe C5-6 narrowing, (2) January 2002 cholecystectomy, (3) depression, (4) anxiety, and (5) a somatoform disorder.[3] (Tr. 14). The ALJ determined that these impairments, neither alone nor in combination, satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ further determined that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 18). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Not Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

---

[3] While not necessary to the Court's recommendation, it is further noted that the ALJ's determination that Plaintiff's migraine headaches are not a severe impairment is not supported by substantial evidence.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work subject to the following limitations: (1) she can only occasionally handle, hold, grasp, reach, manipulate, or finger objects, and (2) she experiences moderate restrictions of social and occupational functioning resulting in minimal diminution of concentration, persistence and pace. (Tr. 19). Based on this RFC determination, the ALJ concluded that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can

10

perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Randall Strahl.

The ALJ asked the vocational expert a series of hypothetical questions. The ALJ first asked the vocational expert to consider an individual who "has a restriction for limited handling, holding, grasping, manipulating, and fingering, with the nondominant upper extremity." (Tr. 535). The vocational expert testified that such an individual could not perform Plaintiff's past relevant work, but could perform "office clerk positions." The vocational expert did not, however, indicate how many such office clerk positions existed that such an individual could perform. *Id.*

The ALJ next asked the vocational expert to further consider that such an individual "has what would be described as moderate restrictions of attention, concentration, and pace such that we're going to say that at least occasionally, they may not be able to work straight through an eight-hour day" (Tr. 535-36). The ALJ asked the vocational expert how such an additional restriction would impact the individual's ability to perform the previously identified "office clerk" positions. (Tr. 536). In response, the vocational expert equivocated, stating that

> Well, usually, employers allow a maximum of 10 percent down time or off-task time. Usually, it's less than that on an individual employer basis, but that's the maximum tolerance. Anything over that isn't tolerated. So, if they're not able to function on their job for over 10 percent of the time, then they wouldn't be able to hold that position.

*Id.*

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff was not disabled because there existed "office clerk" jobs which she could perform despite her limitations. (Tr. 19). While the ALJ stated that there existed a significant number of such jobs, the ALJ failed to identify how many such jobs allegedly existed. While the vocational expert testified

11

that Plaintiff could perform the position of "office clerk," he provided absolutely no testimony as to *how many* such positions allegedly existed. As Plaintiff correctly argues, therefore, there exists "zero evidence" that there exists a *significant number* of jobs which Plaintiff can perform consistent with her RFC.

Accordingly, the Court concludes that the ALJ's decision is not supported by substantial evidence. Recognizing this, Defendant has moved to have the ALJ's decision reversed and this matter remanded to "consider further Plaintiff's functional capacity and to obtain additional vocational expert evidence." Plaintiff objects to a remand of this matter and instead requests that Plaintiff be awarded benefits.

While the Court finds that the ALJ's decision is not supported by substantial evidence, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been resolved and proof of disability is compelling).

While the ALJ's decision is not supported by substantial evidence, neither is the evidence of Plaintiff's disability compelling. While Plaintiff certainly suffers from severe impairments which impose significant limitations, there simply does not exist compelling evidence that she is disabled. In short, the evidence of record is insufficient to support either the Commissioner's position or Plaintiff's position. Accordingly, the Court recommends that this matter be remanded for further factual development pursuant to sentence four of 42 U.S.C. § 405(g).

**CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. The Court further concludes, however, that there does not exist compelling evidence that Plaintiff is disabled. Accordingly, it is recommended that the Commissioner's decision be **reversed** and this matter be **remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  June 6, 2005   /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge